1

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   GARY RUTLEDGE,                    No. CIV S-10-2581-CMK

12              Plaintiff,

13       vs.                           <u>MEMORANDUM OPINION AND ORDER</u>

14   COMMISSIONER OF SOCIAL
     SECURITY,

15              Defendant.

16   _____/

17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20   Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21   judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

22   before the court are plaintiff's motion for summary judgment (Doc. 22) and defendant's cross-

23   motion for summary judgment (Doc. 28).

24   / / /

25   / / /

26   / / /

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on January 31, 2008.  In the application, plaintiff claims that disability began on January 17, 2008.  In his motion for summary judgment, plaintiff claims that disability is caused by a combination of "diabetes, diabetic neuropathy, retinal neuropathy, hypertension, asthma, allergies, obesity, dysthymic disorder, and borderline intellectual functioning" which he claims gives rise to debilitating symptoms, including "pain, fatigue, numbness, swelling, sit/stand/walk limitations, shortness of breath, impaired concentration, persistence, and pace, and decreased vision."  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on September 14, 2009, before Administrative Law Judge ("ALJ") Mark C. Ramsey.   In a February 25, 2010, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1.    The claimant has the following severe impairments: diabetes mellitus; asthma; hypertension, hyperlipidemia; dysthymic disorder; and borderline intellectual functioning;

2.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in the regulations;

3.    The claimant has the residual functional capacity to perform a limited range of light work as defined in 20 C.F.R. § 416.967(b): The claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand and walk up to 6 hours in an 8 hour day, and sit up to 6 hours in an 8 hour day; claimant must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; claimant is limited to simple unskilled work;

4.    The claimant is unable to perform past relevant work;

5.    Considering the claimant's age, education, work experience, and residual functional capacity, and based on application of the Grids, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

After the Appeals Council declined review on June 25, 2010, this appeal followed.

/ / /

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following relevant evidence, summarized chronologically below:

<u>Undated</u> – Plaintiff submitted (presumably in connection with his application for benefits) an Adult Asthma Questionnaire.  He stated that he had last been seen by a doctor in March 2008.  According to plaintiff, he experienced asthma attacks three or four times per week. He stated that he uses inhalers throughout the day.  Plaintiff stated that he had never been seen in the emergency room due to an asthma attack, and that he had never been hospitalized for the condition.  He stated that his asthma is a recurring problem.

<u>Undated</u> – Plaintiff submitted (also presumably in connection with his application) an Exertional Daily Activities Questionnaire.  Plaintiff stated that he lives with family in a house.  He stated that shortness of breath and "slite [sic] dizziness" prevent him from carrying out a normal workday.  Plaintiff stated that on an average day he cleans up around the house and "walk up flight of stairs."  He said it would take him 30 minutes to walk half a mile. Plaintiff stated that he climbs stairs but did not say how this activity affects him.  When asked what kinds of things he can lift and carry, plaintiff responded: "Common household things."

<u>September 18, 2007</u> – Records from Sacramento County Department of Health & Human Services indicates that plaintiff had been without his diabetes medication for the prior two weeks.

<u>April 28, 2008</u> – Dr. Robert Wendel reported that plaintiff's vision was 20/50 in the right and 20/40 in the left.  Pressure was 18 in both eyes.  Dr. Wendel diagnosed active proliferative diabetic retinopathy in the right eye (OD), and nonproliferative diabetic retonopathy in the left eye (OS).  A laser procedure for the right eye was scheduled.

/ / /

/ / /

/ / /

1    <u>April 30, 2008</u> – Agency consultative doctor Hahn X. Pham, M.D., submitted a

2    physical residual functional capacity assessment.  Dr. Pham opined that plaintiff could

3    occasionally lift 50 pounds and frequently lift up to 25 pounds.  Plaintiff could sit/stand/walk for

4    six hours in an 8-hour workday.  Plaintiff's ability to push/pull were found to be unlimited.  No

5    postural, visual, communicative, or manipulative limitations were noted.   As to environmental

6    limitations, Dr. Pham concluded that plaintiff should avoid exposure to fumes, odors, dusts, etc.

7    Dr. Pham noted that plaintiff was not compliant with medications, that his asthma "resolved with

8    treatment in the clinic," and that his activities of daily living were "not that limiting now."  Dr.

9    Pham felt that plaintiff could perform medium work with the noted environmental limitations.

10    <u>June 26, 2008</u> – Agency consultative doctor Sharon Amon, M.D., submitted a

11    physical residual functional capacity assessment.  Dr. Amon concluded that plaintiff could

12    occasionally lift 20 pounds and frequently lift 10 pounds.  Plaintiff could sit/stand/walk for six

13    hours in an 8-hour workday.  Plaintiff push/pull ability was found to be unlimited.  No postural,

14    visual, communicative, or manipulative limitations were noted.   As with Dr. Pham, Dr. Amon

15    did not feel that plaintiff should be exposed to fumes, odors, dusts, etc.  As to the difference

16    between his opinion and Dr. Pham's opinion, Dr. Amon stated that, due to plaintiff's statements

17    that his conditions are worse and that he is unable to walk more than 10 minutes at a time, "light

18    RFC would be more appropriate."  It is interesting to note that, despite citing plaintiff's stated

19    inability to walk more than 10 minutes at a time, Dr. Amon nonetheless concluded that plaintiff

20    could sit/stand/walk for up to six hours in a normal workday.

21    <u>August 24, 2009</u> – A report by Dr. Wendel indicates that plaintiff's vision was

22    20/40 in the right and 20/25 in the left.  Dr. Wendel assessed persistent diabetic macular edema,

23    greater on the right than left.  A laser procedure was scheduled to address the problem.

24    / / /

25    / / /

26    / / /

4

1          <u>December 10, 2009</u> – Sylvia A. Hamilton, Ph.D., reported on a psychological

2 evaluation of plaintiff performed at the request of plaintiff's attorney.  At the time of the

3 evaluation, plaintiff complained of the following physical problems: asthma, allergies, numbness

4 in his feet, edema, diabetes, vision problems, retinal neuropathy, high blood pressure, and

5 neuropathy in the hands.  As to his psychological history, plaintiff reported that he had never

6 been hospitalized in a psychiatric facility, had never been diagnosed with a psychological

7 disorder, and had no family psychiatric history.  Plaintiff also reported that he socializes with

8 family and friends and enjoys attending his son's sporting events.  As to daily activities, the

9 doctor noted:

> Mr. Rutledge stated that he gets up at 7:00 a.m.  He stated that he
> has adequate bathing and grooming habits.  He stated that he helps his
> mother to do some chores in the house.  He spends time with his son and
> attends his sporting events.  He indicated that he does not make his own
> meals.  He stated that he does not help with shopping.  He indicated that
> he probably needs help managing his funds, a payee is therefore needed.

14          On mental status examination, plaintiff was cooperative, though he became

15 anxious upon administration of the WAIS-III test.  Plaintiff's affect was of normal range, and his

16 mood was happy.  There was no evidence of psychotic symptoms.  Plaintiff was able to express

17 thoughts logically.   As to intellectual functioning, Dr. Hamilton opined that the WAIS-III results

18 showed that plaintiff has borderline intellectual functioning.  Dr. Hamilton reported the following

19 diagnosis:

> With regard to his diagnosis, the present results suggest that Mr.
> Rutledge has suffered from developmental delays, which likely affect his
> current life experience.  He appears to have difficulty with timed tasks that
> require concentration, attention, memory, and processing speed as
> evidenced by his below average performance on the WAIS-III subtests,
> hence the diagnosis of Borderline Intellectual Functioning.  The diagnosis
> of Dysthymic Disorder is offered because he reportedly has experienced
> mild feelings of depression for an extended period of time.  These
> symptoms do appear to interfere with his cognitive functioning in his daily
> life.

26 ///

As to plaintiff's functional capabilities, Dr. Hamilton opined as follows:

> Mr. Rutledge has below-average intelligence and inadequate academic skills. His learning potential is therefore considered to be below average. With regard to his test results, Mr. Rutledge is able to carry out simple one-part tasks. He is not capable of carrying out two-part or complex tasks. There is some moderate impairment in his personal skills or daily functioning. He is not capable of traveling independently. Mr. Rutledge's test results indicate that he is not capable of handling his own finances. He would likely require a payee.

> Mr. Rutledge has a Dysthymic Disorder. His dysthymia is likely to require access to psychiatric and/or medical treatment. He can be expected to have moderate difficulty meeting the demands of work settings for sustained concentration, mental alertness, task completion, and work efficiency. His potential to perform duties that require good hand-eye coordination are likely to be impeded by decreased finger to hand dexterity. He has some impairment in his interactions with peers, given his limited close interpersonal relationships. In a work setting, he is more inclined to work with specific instructions within his skill set avoiding complex tasks.

## III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## IV.  DISCUSSION

In his motion for summary judgment, plaintiff argues: (1) the ALJ improperly rejected the opinion of examining psychologist Dr. Hamilton without a legitimate basis for doing so; (2) the ALJ failed to evaluate the impact of plaintiff's obesity; (3) the ALJ failed to provide clear and convincing reasons for rejecting plaintiff's testimony; and (4) the ALJ improperly relied on the Grids despite the presence of extensive non-exertional limitations.

### A.    Evaluation of Medical Opinions

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict. See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence. See Lester, 81 F.3d at 830. This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding. See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989). Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional. See Lester, 81 F.3d at 830-31. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. See id. at 831. In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings. See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

As to Dr. Hamilton, the ALJ stated:

. . . On October 21, 2009, the claimant underwent a psychological evaluation with Sylvia A. Hamilton, Ph.D. At this time, the claimant achieved a verbal IQ of 87, a performance IQ of 78, and a full scale IQ of 81, placing the claimant in the low average range of intelligence. Dr. Hamilton subsequently assessed the claimant with dysthymic disorder and [borderline intellectual functioning].

* * *

In social functioning, the claimant has mild difficulties. Although the claimant showed some anxiousness during his October 2009 psychological testing, Dr. Hamilton noted that the claimant was otherwise generally cooperative. The claimant also admits that he is able to help his mother with chores and attend his son's sporting events (Exhibit 14F, pg. 3). Therefore, the evidence establishes that the claimant has no more than "mild" limitation in this area.

* * *

It should be noted that Dr. Hamilton opined that the claimant would have limitations due to decreased finger to hand dexterity (Exhibit 14F, pg. 5). However, Dr. Hamilton is a psychological evaluator and therefore does not have the expertise to fully assess the claimant's physical impairments. Therefore, Dr. Hamilton's opinion is given little weight with regard to the claimant's physical limitations.

With regard to the claimant's mental limitations, the undersigned notes that the claimant's lawyer referred the claimant to Dr. Hamilton for a psychological evaluation. Therefore, Dr. Hamilton was likely acting as more of an advocate for the claimant than as an impartial and independent healthcare professional. However, the undersigned partially credits Dr. Hamilton's opinion with regard to the claimant's ability to engage in only simple work (Exhibit 14F, pg. 5). The undersigned also partially credits the claimant with regard to his difficulties with certain tasks. Therefore, the above residual functional capacity also limits the claimant to simple unskilled work.

Plaintiff argues that the ALJ's analysis is flawed because "[t]here was absolutely no evidence in the record to support the ALJ's contention that Dr. Hamilton was 'acting as an advocate' for Mr. Rutledge." Plaintiff also contends that the ALJ erred because Dr. Hamilton's opinions were not contradicted by any other medical professional.

The court finds no error because, contrary to plaintiff's reading of the hearing decision, the ALJ did not reject Dr. Hamilton's opinions. In fact, Dr. Hamilton ultimately concluded that plaintiff could work. The doctor stated: "In a work setting, he is more inclined to work with specific instructions within his skill set avoiding complex tasks" (emphasis added). This indicates that Dr. Hamilton believed that plaintiff could perform work involving simple tasks. This is consistent with Dr. Hamilton's finding that plaintiff is capable of simple tasks. Given that the ALJ found plaintiff capable of simple unskilled work, Dr. Hamilton's opinion was accepted.

To the extent Dr. Hamilton stated that plaintiff cannot perform two-part tasks, this statement is at odds with the doctor's statement that plaintiff can perform simple tasks, but not complex tasks, because simple tasks necessarily involve one- or two-step directives. It is also inconsistent with the doctor's ultimate conclusion that plaintiff can function in a work setting so long as he avoids complex tasks because, if plaintiff were incapable of even carrying one-part

1   directives, he would not be able to perform any activities in a work setting.  The ALJ was entitled

2   to resolve this apparent conflict and conclude that Dr. Hamilton allowed for simple unskilled

3   work.

4            **B.      Plaintiff's Obesity**

5            In 1999, obesity was removed from the Listing of Impairments.[1]  Obesity may still

6   enter into a multiple impairment analysis, but "only by dint of its impact upon the claimant's

7   musculoskeletal, respiratory, or cardiovascular system."  Celaya v. Halter, 332 F.3d 1177, 1181

8   n.1 (9th Cir. 2003).  Thus, as part of his duty to develop the record, the ALJ is required to

9   consider obesity in a multiple impairment analysis, but only where it is "clear from the record

10  that [the plaintiff's] obesity . . . could exacerbate her reported illnesses."  Id. at 1182; see also

11  Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005) (distinguishing Celaya and concluding that

12  a multiple impairment analysis is not required where "the medical record is silent as to whether

13  and how claimant's obesity might have exacerbated her condition" and "the claimant did not

14  present any testimony or other evidence . . . that her obesity impaired her ability to work").

15  Where a multiple impairment analysis is not required, the ALJ properly considers obesity by

16  acknowledging the plaintiff's weight in making determinations throughout the sequential

17  analysis.  See Burch, 400 F.3d at 684.

18          Plaintiff contends that the ALJ erred by making no mention whatsoever of

19  plaintiff's "obvious obesity."  In response, defendant argues:

20          Plaintiff also argues that the RFC is flawed because the ALJ failed
        to consider Plaintiff's purported obesity under SSR 02-1p. (citations to
21      plaintiff's brief omitted).  To begin, Plaintiff offers no cite from a health
        care provider stating that he is obese or overweight or even recommending
22      weight loss.  The source of the obesity diagnosis is Plaintiff himself.
        Plaintiff speculates that obesity can cause limitations in various activities,
23      such as sitting, carrying, and tolerating extreme environmental conditions.
        But, he does not point to *any evidence* of functional limitations as a result

24

25          [1]      Under SSR 02-01p, a person with body mass index ("BMI") of 30 or above is
    considered obese.  BMI is the ratio of an individual's weight in kilograms to the square of height
26  in meters (weight divided by square of height).

1    of his purported obesity, even assuming there was such a diagnosis or
     reference in the record.
2

3    The court agrees with defendant.  There is no evidence that plaintiff was ever diagnosed as obese

4    or that his weight contributed to any functional limitation.[2]  Nor is there evidence that plaintiff

5    ever claimed that obesity was a factor in his alleged disability.  When plaintiff filed his

6    application for benefits, he claimed disability arising from "diabetes, stomach pain, blood clots in

7    legs, asthma."  He did not list obesity.  When asked how these listed problems limit his ability to

8    work, plaintiff stated: "[D]ue to lot of pain, asthma, and breathing problems I can not bend, move

9    do things, walk or stand for longer period."  Again, he did not mention weight as a limiting

10   factor.  Because plaintiff did not complain at the agency level of limitations resulting, at least in

11   part, from his weight, and because plaintiff was never diagnosed by a medical professional as

12   obese, the court finds no error.

13        **C.    <u>Plaintiff's Credibility</u>**

14        The Commissioner determines whether a disability applicant is credible, and the

15   court defers to the Commissioner's discretion if the Commissioner used the proper process and

16   provided proper reasons.  See <u>Saelee v. Chater</u>, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

17   credibility finding must be supported by specific, cogent reasons.  See <u>Rashad v. Sullivan</u>, 903

18   F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See <u>Lester v. Chater</u>, 81 F.3d

19   821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

20   and what evidence undermines the testimony.  See <u>id.</u>  Moreover, unless there is affirmative

21   evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

22   credible must be "clear and convincing."  See <u>id.</u>; see also <u>Carmickle v. Commissioner</u>, 533 F.3d

23   1155, 1160 (9th Cir. 2008) (citing <u>Lingenfelter v Astrue</u>, 504 F.3d 1028, 1936 (9th Cir. 2007),

24   and <u>Gregor v. Barnhart</u>, 464 F.3d 968, 972 (9th Cir. 2006)).

25   _____

26        [2]    Plaintiff's own summary of the evidence, as set forth in his motion for summary
     judgment, does not reflect any diagnosis of obesity.

11

1          If there is objective medical evidence of an underlying impairment, the

2    Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

3    because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

4    341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

5                  The claimant need not produce objective medical evidence of the
     [symptom] itself, or the severity thereof.  Nor must the claimant produce

6    objective medical evidence of the causal relationship between the
     medically determinable impairment and the symptom.  By requiring that

7    the medical impairment "could reasonably be expected to produce" pain or
     another symptom, the Cotton test requires only that the causal relationship

8    be a reasonable inference, not a medically proven phenomenon.

9    80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
     Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

10

11         The Commissioner may, however, consider the nature of the symptoms alleged,

12   including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

13   947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

14   claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

15   testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

16   prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

17   physician and third-party testimony about the nature, severity, and effect of symptoms.  See

18   Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

19   claimant cooperated during physical examinations or provided conflicting statements concerning

20   drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

21   claimant testifies as to symptoms greater than would normally be produced by a given

22   impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

23   Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

24   / / /

25   / / /

26   / / /

1          Regarding reliance on a claimant's daily activities to find testimony of disabling

2    pain not credible, the Social Security Act does not require that disability claimants be utterly

3    incapacitated.  See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  The Ninth Circuit has

4    repeatedly held that the   ". . . mere fact that a plaintiff has carried out certain daily activities . . .

5    does not . . .[necessarily] detract from her credibility as to her overall disability."  See Orn v.

6    Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th

7    Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a

8    claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic

9    restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the

10   claimant was entitled to benefits based on constant leg and back pain despite the claimant's

11   ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home

12   activities are not easily transferable to what may be the more grueling environment of the

13   workplace, where it might be impossible to periodically rest or take medication").   Daily

14   activities must be such that they show that the claimant is ". . .able to spend a substantial part of

15   his day engaged in pursuits involving the performance of physical functions that are transferable

16   to a work setting."  Fair, 885 F.2d at 603.  "Only if the level of activity were inconsistent with

17   Claimant's claimed limitations would these activities have any bearing on Claimant's

18   credibility."  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  The ALJ must make specific

19   findings in this regard before relying on daily activities to find a claimant's pain testimony not

20   credible.  See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

21          As to plaintiff's testimony, the ALJ stated:

22          The claimant testified that he experiences pain, numbness, and swelling in
             his hands and feet as a result of his diabetes.  He also testified that when
23          his feet swell his toenails become ingrown.  The claimant further testified
             that he has been hospitalized 5-6 times for diabetic-related infection.  As a
24          result of these symptoms, the claimant testified that he is unable to sit,
             stand, or walk for prolonged period of time.  The claimant also testified
25          that he must move around every 20 minutes to help increase circulation in
             his extremities.  Furthermore, the claimant testified that he must frequently
26          elevate his feet and soak them with Epsom salts.  He also testified that he

                                              13

has problems using his hands to write or lift items, and that he has significant difficulty seeing due to his diabetic retinopathy. Moreover, the claimant testified that the medications he takes for these conditions make him feel drowsy.

With regard to his asthma, the claimant testified that he continues to experience breathing problems, especially during the summer and on windy days.

Finally, with regard to the claimant's mental condition, the claimant reports that he has difficulty with certain tasks, such as managing his finances (Exhibit 14F, pg. 3). He also testified that his reading is mediocre and that he got mostly D's in school. Indeed, the claimant's school records support this allegation (Exhibit 3E).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The record reveals that the claimant's diabetes mellitus is not so severe so as to preclude the claimant from walking. The claimant's diabetic-related symptoms and conditions appear to be most significant only when the claimant is non-compliant with treatment. Indeed, the claimant has a long history of non-compliance with treatment. In May 2007, the claimant reported that he had been without his diabetic medications for 2 weeks. Then in November 2007, SCDH healthcare providers documented that the claimant had missed his last 3 appointments (Exhibit 1F, pg. 5-9). Soon after in March 2008, the claimant reported that he had not checked his blood sugars because his meter broke. The following month, the claimant claimed that he lost his meter and had also forgotten to take his medications the night before (Exhibit 3F, pg. 5-6). The claimant was again assessed with non-compliance at SCDH in late 2008, after admitting that he had not taken his pills that day and had only been checking his blood sugars in the morning (Exhibit 11F, pg. 7-8).

During the claimant's March 2009 hospitalization for right posterior neck abscess, healthcare providers again determined that the claimant had been non-compliant with his diabetic medications. At this time, healthcare providers stressed to the claimant the importance of being compliant with his treatment plan (Exhibit 10F, pg. 2-4).

Despite this non-compliance, the claimant's diabetes has been noted to be improving (Exhibit 5F, pg. 5). Follow up examinations also revealed that the claimant's neck abscess soon resolved with no evidence of pain or further infection (Exhibit 11F, pg. 2-7). Furthermore, RCMG records indicate that the claimant's decreases in visual acuity have been only slight. Indeed, in August 2009, RCMG records describe the claimant's central decrease in visual acuity with floaters as "mild" (Exhibit 12F, pg.

14

2, 17-21).

The claimant's asthma is also not as severe as he alleges.  Medical records reveal that the claimant has shown clinical improvement on Albuterol (Exhibit 1F, pg. 3).  Indeed, although the claimant showed decreased air movement upon examination in March 2009, his lungs were clear to auscultation bilaterally.  He also showed no wheezes, rales, or rhonchi.  At this time, healthcare providers determined that the claimant's asthma showed no evidence of exacerbation (Exhibit 10F, pg. 4-7).  SDCH records also reveal that the claimant's lungs were clear to auscultation bilaterally in July 2009 (Exhibit 11F, pg. 2).  In fact, the claimant admits that he has never been in the emergency room or hospitalized for an asthma attack (Exhibit 4E, pg. 2).

With regard to the claimant's hypertension and hyperlipidemia, medical records show that these conditions have been conservatively treated with medications.  The claimant's blood pressure has also been measured within normal limits, and the claimant's hyperlipidemia is noted to be improving (Exhibit 1F, pg. 6 and Exhibit 5F, pg. 5).  Indeed, in late 2008, SDCH records documented that the claimant's hypertension and hyperlipidemia were "at goal."  Furthermore, the claimant's physical examination reveals that the claimant's heart has exhibited a regular rate and rhythm, with a normal S1 and S2 and no murmurs, rubs, or gallops (Exhibit 10F, pg. 3-7 and Exhibit 11F, pg. 8).

Finally, the claimant's mental impairments are not so severe as to preclude the claimant from working.  As discussed above, the claimant is capable of engaging in activities of daily living and socializing with others (Exhibit 5E and Exhibit 14F, pg. 3-4).  Indeed, the claimant testified that he attends church twice a week.  He also testified that he is able to do basic math, showing that he is capable of some degree of focus and concentration.

In making these determinations, the undersigned gives great weight to the medical record in its entirety.

After examining the evidence, state agency consultant Hahn X. Pham, M.D., opined that the claimant is capable of a medium range of work (Exhibit 2F).  However, state agency consultant S. Amon, M.D., soon after opined that the claimant is capable of a light range of work.  Specifically, Dr. Amon opined that the claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand and walk up to 6 hours in an 8 hour day; and sit up to 6 hours in an 8 hour day.  Dr. Amon also opined that the claimant should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to his history of asthma (Exhibit 7F).  In resolving these inconsistencies, the undersigned gives greater weight to the opinion of Dr. Amon, who had a more longitudinal view of the medical evidence.  Dr. Amon's assessment is therefore reflected in the above residual functional capacity.

///

The ALJ then discussed Dr. Hamilton's opinions, which are addressed above.  The ALJ

continued his credibility analysis as follows:

> However the undersigned does not fully credit the testimony and
> allegations of the claimant.  As discussed above, the record reveals that the
> claimant's impairments are not as severe as he alleges.  Although the
> claimant alleges that his pain medications make him drowsy, there is no
> evidence that these side effects significantly affect the claimant's ability to
> function.  Indeed, the claimant admits that he is able to engage in many
> activities inconsistent with a disabling impairment.  For example, the
> claimant is able to care for his personal hygiene, attend his son's sporting
> events, and keep his home clean (Exhibit 5E, pg. 1-2 and Exhibit 14F, pg.
> 3).  For these reasons, the claimant's credibility is negatively affected.

Plaintiff argues that the ALJ erred with respect to: (1) asthma; (2) hypertension;

(3) diabetes; (4) diabetic neuropathy and retinopathy; and (5) mental impairments.

      1.     Asthma

Plaintiff argues that the ALJ erred by stating that plaintiff "showed no wheezes,

rales, or rhonchi."  According to plaintiff, the record contains several instances not cited by the

ALJ where plaintiff was observed actively wheezing.  Assuming for the moment that the ALJ

misstated the evidence with respect to plaintiff's wheezing symptoms, the record nonetheless

demonstrates, and the ALJ accurately noted, that plaintiff experienced clinical improvement in

his asthma with medication.  In March 2009 plaintiff's lungs were clear.  They were also clear in

July 2009.  By plaintiff's own admission, his asthma has never been so severe as to require

hospitalization or emergency room treatment.  Setting aside any misstatement with respect to

observances of wheezing, these additional reasons support the ALJ's analysis as to plaintiff's

asthma.

      2.     Hypertension

Plaintiff argues that, despite the ALJ's statement that plaintiff's hypertension and

hyperlipidemia were "at goal" in late 2008, records reveal that his blood pressure was not "at

goal" when measured in November 2008 and March 2009.  Again, despite any misstatement of

the record the ALJ may have made, the fact remains that plaintiff's hypertension and

1    hyperlipidemia have been conservatively treated with medication and plaintiff's hyperlipidemia

2    was noted to be improving with this conservative treatment.

3              3.    Diabetes

4                    Plaintiff argues that the ALJ's observation that plaintiff's diabetes appeared to be

5    most significant only when he was not compliant with medication is of no moment because the

6    record reflects that his diabetes symptoms were erratic whether or not he took his medications.

7    In other words, he argues, his non-compliance with medication had no effect on his diabetes.

8    This argument is unpersuasive given that plaintiff's own doctors have stressed the importance of

9    compliance with medications, which they would not have done had compliance been irrelevant.

10   Moreover, as the ALJ noted, despite non-compliance, the records reflect that plaintiff's diabetes

11   has been improving over time.

12             4.    Diabetic neuropathy and retinopathy

13                   Plaintiff states: "In addition, Mr. Rutledge suffered from diabetic neuropathy in

14   his feet and retinopathy."  Plaintiff then lists various instances documented in the record where

15   he has subjectively complained of difficulty sitting for extended periods of time, as well as

16   standing and walking.  He adds that there is no cure for the condition.  The court fails to see any

17   connection between plaintiff's recitation of his subjective complaints and an error on the ALJ's

18   part.  As to diabetic neuropathy, no doctor has opined that plaintiff is significantly limited due to

19   this condition.  As to his retinopathy, plaintiff states that this condition is not reversible and not

20   curable.  Again, the court fails to see how this statement of fact equates to some error on the

21   ALJ's part.  And the fact remains that the decrease in plaintiff's visual acuity – irreversible

22   though it is – has been only slight.

23   / / /

24   / / /

25   / / /

26   / / /

17

1          5.     Mental Impairments

2          Plaintiff argues that the ALJ overstated his daily activities when discussing the

3   credibility of plaintiff's testimony concerning limitations caused by his mental impairments.

4   Plaintiff argues:

5               First, Mr. Rutledge did not testify that he attended church twice a
        week.  He testified that he attended church twice a *month* – a big
6        difference.  Second, Mr. Rutledge claimed to be able to do basic math, but
        when asked to multiply 25 x 4 he stated that the answer was 60.  TR 48.
7        Clearly, his grasp of math was deficient and certainly did not demonstrate
        a capacity for focus and concentration.  Moreover, mere evidence of the
8        ability to take care of ones personal needs, perform housework, shop
        alone, or occasionally go to church, is not inconsistent with a finding of
9        disability.  (citation omitted).

10         Setting aside for the moment any possible error with respect to the number of

11  times plaintiff attends church per week or month, as well as any possible error with respect to

12  plaintiff's math abilities, the ALJ cited "activities of daily living and socializing with others"

13  which, in the ALJ's opinion, were inconsistent with plaintiff's testimony of disabling symptoms.

14  Thus, the question is whether there are daily activities — other than attending church and doing

15  math – which support the ALJ's analysis.  If so, then there is no error.

16         Plaintiff reported to Dr. Hamilton – the only mental health professional to have

17  rendered an opinion in this case – that he cares for his son, helps his mother with household

18  chores, attends his son's sporting events, and has no difficulties with grooming or bathing.

19  Plaintiff also stated on the Exertional Daily Activities Questionnaire that his daily activities were

20  limited by shortness of breath and dizziness, not mental impairments.  Finally, despite reported

21  limitations, Dr. Hamilton concluded that plaintiff could perform simple unskilled tasks in a work

22  setting.  On all of this evidence, the court finds no error in the ALJ's analysis of the credibility of

23  plaintiff's statements concerning his mental limitations.

24  / / /

25  / / /

26  / / /

**D.   Application of the Grids**

The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about disability for various combinations of age, education, previous work experience, and residual functional capacity.  The Grids allow the Commissioner to streamline the administrative process and encourage uniform treatment of claims based on the number of jobs in the national economy for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458, 460-62 (1983) (discussing creation and purpose of the Grids).

The Commissioner may apply the Grids in lieu of taking the testimony of a vocational expert only when the Grids accurately and completely describe the claimant's abilities and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the Grids if a claimant suffers from non-exertional limitations because the Grids are based on exertional strength factors only.[3]  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b). "If a claimant has an impairment that limits his or her ability to work without directly affecting his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered by the Grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

---

[3]      Exertional capabilities are the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  See 20 C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§ 404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  See 20 C.F.R. §§ 404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  See 20 C.F.R. §§ 404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  See 20 C.F.R. §§ 404.1567(e) and 416.967(e).
        Non-exertional activities include mental, sensory, postural, manipulative, and environmental matters which do not directly affect the primary strength activities.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(e).

1   Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

2   even when a claimant has combined exertional and non-exertional limitations, if non-exertional

3   limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d

4   1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

5          In cases where the Grids are not fully applicable, the ALJ may meet his burden

6   under step five of the sequential analysis by propounding to a vocational expert hypothetical

7   questions based on medical assumptions, supported by substantial evidence, that reflect all the

8   plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

9   where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

10  ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

11  1341 (9th Cir. 1988).

12         Applying the Grids, the ALJ concluded that, while plaintiff does not have the

13  residual functional capacity to perform the full range of light work, his limitations "have little or

14  no effect on the occupational base of unskilled light work, as there are numerous simple

15  unskilled jobs available that would not subject the claimant to a concentrated exposure of

16  environmental irritants."  Plaintiff argues that, in reaching the conclusion, the ALJ "failed to

17  properly credit the opinions of Dr. Hamilton; failed to credit Mr. Rutledge's testimony; and failed

18  to properly evaluate the medical evidence as a whole regarding his functional limitations."  For

19  the reasons discussed above, the court finds no error in these areas.  Plaintiff claims that his

20  functional limitations "are non-exertional in the main."  Specifically, he cites pain, numbness,

21  swelling, shortness of breath, sit/stand/walk limitations, need to elevate his feet, and impaired

22  concentration and focus.  As discussed above, however, the record does not support a finding that

23  any of these limitations more than minimally impact plaintiff's exertional capabilities.  Finally,

24  for the reasons discussed above in connection with the ALJ's analysis of Dr. Hamilton's opinion,

25  the court rejects plaintiff's argument that he is limited to performing only one-step tasks.

26  / / /

1

2                                    **V.  CONCLUSION**

3              Based on the foregoing, the court concludes that the Commissioner's final

4   decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY

5   ORDERED that:

6              1.      Plaintiff's motion for summary judgment (Doc. 22) is denied;

7              2.      Defendant's cross-motion for summary judgment (Doc. 28) is granted; and

8              3.      The Clerk of the Court is directed to enter judgment and close this file.

9

10  DATED:  March 22, 2012

11

12                                        **CRAIG M. KELLISON**
                                          UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26